DGR:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SHANE HENNEN,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

<u>COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT</u>

(18 U.S.C. §§ 1349, 1956(a)(1)(A)(i), 2 and 3551 <u>et seq</u>.)

Case No. 25-mj-00006

EASTERN DISTRICT OF NEW YORK, SS:

       RUSSELL LANTIER, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

       In or about and between January 2024 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SHANE HENNEN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Betting Company 1, an online sports betting company the identity of which is known to your affiant, and to obtain money and property from Betting Company 1 by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

      (Title 18, United States Code, Sections 1349 and 3551 <u>et seq</u>.)

In or about January 2024, within the Eastern District of New York and elsewhere, the defendant SHANE HENNEN, together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions, to wit: one or more transactions affecting interstate and foreign commerce and involving the use of a financial institution that is engaged in, and the activities of which affect, interstate and foreign commerce, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: (i) bribery in sporting contests, in violation of Title 18, United States Code, Section 224; and (ii) wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(l)(A)(i).

(Title 18, United States Code, Sections 1956(a)(l)(A)(i), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the FBI and have been involved in the investigation of cases involving money laundering, bribery in sporting contests, wire fraud, conspiracy and illegal gambling. I am familiar with the facts and circumstances set forth below from, among other things, my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

2. As set forth more fully below, since in or about March 2024, the FBI has been investigating, among other things, a fraudulent scheme to "fix" the performance of certain

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

professional athletes in specific games in order to make profitable bets on the athlete's performance in that game (the "Fraudulent Wager Scheme"). As part of the scheme, co-conspirators obtained inside information concerning things like an athlete's pre-planned intent to purposely withdraw from a game, and thereby depress the athlete's performance in that game, co-conspirators in the scheme placed fraudulent bets that the athlete would underperform in the game. Armed with their inside information concerning the athlete's intent to purposely withdraw, many of the bettors' fraudulent prop bets paid out successfully and the proceeds of their scheme were subsequently laundered through the U.S. financial system.

I.      The Defendant and Relevant Entities and Individuals

3. The defendant SHANE HENNEN was a citizen of the United States and a resident of Las Vegas, Nevada.

4. Financial Institution 1, the identity of which is known to the affiant, was a financial institution based in New York, New York.

5. The National Basketball Association ("NBA") was a professional basketball league in North America comprised of 30 teams. The NBA maintained a code of conduct applicable to its players and which, among other things, prohibited wagering in connection with NBA games.

6. Betting Company 1, the identity of which is known to the affiant, was a sportsbook that operated both physical sportsbooks and an online platform that offer sports betting relating to, among other things, NBA games and individual players' statistical performances in connection with NBA games. Betting Company 1 operated a physical sportsbook within a hotel & casino (the "Casino") in Atlantic City, New Jersey.

7. NBA Player 1, whose identity is known to the affiant, was a citizen of the United States and a professional basketball player in the NBA, including during the 2023-2024 NBA season. On July 10, 2024, NBA Player 1 pled guilty in the Eastern District of New York to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme. See 24-CR-270 (LDH).

8. Co-Conspirator 1, whose identity is known to the affiant, was a citizen of the United States and a resident of Queens, New York. Co-Conspirator 1 has pled guilty in the Eastern District of New York to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme.

9. Co-Conspirator 2, whose identity is known to the affiant, was a citizen of the United States and a resident of Brooklyn, New York. A grand jury sitting in the Eastern District of New York previously returned an indictment charging Co-Conspirator 2 with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme.

10. Co-Conspirator 3, Co-Conspirator 4 and Co-Conspirator 5, whose identities are known to your affiant, were citizens of the United States.

II.     Background on Sports Betting

11. In 1992, following several high-profile sports-betting scandals, Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating, or regulating sports wagering. The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

12. In May of 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing six years, sports betting, and particularly online sports betting, became legal in over 35 states.

13. In recent years, online sportsbooks like Betting Company 1 made it possible for bettors to open an online account and place wagers using their phone. Bettors could generally wager on the moneyline, spread, over/under, parlays, props and futures.

14. A "prop," or proposition bet, was a bet placed on an individual player's performance, rather than on the outcome of the game. A prop was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. For example, a betting platform could offer users a wager that a certain player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting platform for a given game. In addition to adult professional athletes who compete on team sports, prop bets could be placed on college students, individual athletes, and child professional athletes (i.e., professional athletes who are under the age of 18).

15. A "parlay" bet or a "parlay" was a bet comprised of two or more individual bets. In order for a bettor to win a parlay, each bet, or "leg," within the parlay had to win.

16. A moneyline bet was a wager placed on a game's outcome.

17.     A futures bet was a bet on the outcome of a multi-stage event such as a season or a tournament.   Futures could refer to either team or player markets, such as which team would win their division, league, or championship.

18.     Before placing any bet, all bettors wagering through Betting Company 1 had to agree to its terms of use (the "Terms of Use"), which both provided, in sum, substance and in part, that users were prohibited from wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public injury information.   The Terms of Use also prohibited individuals from using other individuals' accounts to place wagers.

III.    The Fraudulent Wager Scheme

   A.    Summary

19.     As described more fully below, the defendant SHANE HENNEN, together with others, conspired to place fraudulent "under" prop bets on NBA Player 1's performance in the January 26 and March 20 Games, knowing in advance that NBA Player 1 planned to withdraw from those games for purported health reasons, thus rendering such prop bets successful.   Thereafter, HENNEN, together with others, laundered the proceeds derived from that fraudulent scheme through one or more financial transactions designed, in whole or in part, to conceal the criminal origin of those funds.

   B.    The January 26 Game

20.     As demonstrated in text messages, mobile application records, and wire transfer records, among other evidence, by the beginning of 2024, NBA Player 1 had amassed

6

significant gambling debts to, among others, Co-Conspirator 2, who then encouraged NBA Player 1 to clear those debts by engaging in the NBA Player 1 "special," i.e., withdrawing from certain games prematurely to ensure that under prop bets on NBA Player 1's performance were successful.

21. On January 22, 2024—four days before the January 26 Game— NBA Player 1 sustained a purported eye injury during an NBA game (the "January 22 Game"). NBA Player 1 was evaluated by a doctor after the January 22 Game and diagnosed with a corneal abrasion. However, NBA Player 1 did not subsequently complain about the purported injury and was not placed on the NBA's injury list.

22. On or about January 23, 2024, Co-Conspirator 1 texted the defendant SHANE HENNEN a screenshot of a chat between Co-Conspirator 1 and two of Co-Conspirator 1's contacts—Co-Conspirator 2 and NBA Player 1, respectively—that occurred on January 22, 2024. In the chat, NBA Player 1 messaged Co-Conspirator 2 and Co-Conspirator 1 during the January 22 Game and stated the following:

| | |
|---|---|
| NBA Player 1: | I went back to locker room to get eye checked on |
| NBA Player 1: | Idk if imma play much more |
| NBA Player 1: | I'm<br>Not starting second half |
| NBA Player 1: | But if it's garbage time I will shoot a million shots." |

I believe that in this exchange NBA Player 1 was advising Co-Conspirator 2 and Co-Conspirator 1 about his status and his expectation he may not play the rest of the game, but that, if he did in "garbage time," he would take a large number of shots. Based on my participation in the investigation to date, I am aware that this type of information is highly relevant to bettors interested in placing prop bets on an NBA game.

7

23. Text message communications obtained during the course of the investigation show that three days after this exchange, and hours before the January 26 Game, NBA Player 1 messaged, among others, Co-Conspirator 1 and Co-Conspirator 2, that NBA Player 1 would be removing himself early from the January 26 Game claiming that he was injured.

24. Text message communications obtained during the investigation show that Co-Conspirator 1 subsequently messaged the defendant SHANE HENNEN the inside information concerning NBA Player 1's intent to remove himself early from the January 26 Game, with the understanding that HENNEN would wager based on such information.

25. Specifically, on January 26, 2024, Co-Conspirator 1 messaged the defendant SHANE HENNEN to "call 911." At approximately that same time, Co-Conspirator 1 forwarded a message to HENNEN from NBA Player 1. The forwarded message read, "Hit unders for the big numbers. I told [Co-Conspirator 2] no blocks no steals. I'm going to play first 2-3 minute stint off the bench then when I get subbed out tell them my eye killing me again." Based on my participation in the investigation to date, I believe the forwarded message reflected NBA Player 1's intent to purposefully underperform during the January 26, 2024 game. NBA Player 1 relayed he would have no blocks or steals; play the first "2-3 minutes" as a substitute from the bench and then remove himself from the game by claiming eye pain.

26. After forwarding the messages from NBA Player 1, Co-Conspirator 1 then sent the defendant SHANE HENNEN two screenshots that I recognize to be betting slips for wagers placed on NBA Player 1's performance during the January 26 Game which specifically wagered in accordance with his expected underperformance during the game by taking the "under" position on each. Among them included a $29,382 parlay wager that, among other

8

things, bet the "under" on NBA Player 1's rebounds and points, which bet, if successful, would pay out approximately $103,387.

27. After receiving the above-described inside information regarding NBA Player 1's intended underperformance, the defendant SHANE HENNEN, acting through proxies or straw bettors, placed wagers on NBA Player 1 "unders" in connection with NBA Player 1's performance during the January 26 Game.

28. For example, at approximately 6:13 p.m. EST on January 26, 2024 Co-Conspirator 3 texted the defendant SHANE HENNEN a screenshot of a betting slip for a wager placed by Co-Conspirator 3 through Betting Company 1 totaling $3,700 on NBA Player 1 "under rebounds" in connection with NBA Player 1's performance during the January 26 Game. The screenshot is depicted below.



29.     Hours later, shortly after NBA Player 1 removed himself from the January 26 Game, Co-Conspirator 3 texted the defendant SHANE HENNEN: "You are +1114." Through that message, Co-Conspirator 3 was telling HENNEN that, as a result of the bet that Co-Conspirator 3 had placed on NBA Player 1's unders, HENNEN's account had realized profits and had a positive balance of $1,114. Based on my training, experience and participation in this investigation, I know it is common for individuals such as HENNEN who place bets through proxies or straw bettors to have running accounts and tabs with their proxies, which tabs reflect whether the bettor's account is profitable (i.e., in the green, or in the positive) or unprofitable (i.e., in the red, or in the negative) at any given time.

30.     Thereafter, the defendant SHANE HENNEN requested that Co-Conspirator 3 send $1,114 to HENNEN's account at Financial Institution 1. Co-Conspirator 3

then texted HENNEN: "Money sent 1114 please confirm thanks," to which HENNEN responded: "received." A review of records provided by Financial Institution 1 show that a financial transaction between Co-Conspirator 3 and HENNEN totaling $1,114 was processed by Financial Institution 1 on or about January 28, 2024.

31. On January 26, 2024, the defendant SHANE HENNEN texted Co-Conspirator 4 "We got lucky," to which Co-Conspirator 4 responded by stating "wish me luck" and sending HENNEN a photo of a betting slip for a wager totaling $16,560 placed on NBA Player 1 "under points" in connection with NBA Player 1's performance during the January 26 Game, as shown below. In response, HENNEN texted Co-Conspirator 4 "We at 16k," which, based on my training, experience and participation in this investigation, I know refers to Co-Conspirator 4's above-described wager totaling $16,560.

32. NBA Player 1 was ultimately not on the NBA's injury list prior to the January 26 Game. NBA Player 1 entered the January 26 Game midway through the first quarter. Consistent with his prior statements to co-conspirators, after playing just four minutes and recording zero points, three rebounds and one assist, NBA Player 1 removed himself from the game after he complained to team officials that he reaggravated the above-described eye injury. Video footage of the January 26 Game neither shows any contact with NBA Player 1's eyes, nor any apparent reaggravation of the eye injury. NBA Player 1 did not subsequently complain to team officials about the purported eye injury after the January 26 Game and played in his team's next game two days later.

33. NBA Player 1's performance in several statistical categories during the January 26 Game was under the designated amounts set by betting companies, including Betting Company 1, in their prop bets related to NBA Player 1. Thus, bettors who wagered the "under"

on prop bets related to NBA Player 1's performance for the January 26 Game won those bets, including Co-Conspirator 3 and Co-Conspirator 4 as described above.

C. The March 20 Game

34. Text message communications obtained during the course of the investigation show that, prior to the March 20 Game, NBA Player 1 told Co-Conspirator 1 and Co-Conspirator 2, in sum and substance, that NBA Player 1 would be removing himself early from the March 20 Game, claiming that he was ill.

35. Text message communications, betting records and surveillance footage, among other evidence, show that on March 20, 2024, Co-Conspirator 1, Co-Conspirator 2 and other co-conspirators all met at the Casino in Atlantic City to place bets on NBA Player 1. Once at the Casino, Co-Conspirator 2 and Co-Conspirator 1, together with other co-conspirators, placed the first of their several bets on NBA Player 1 before the March 20 Game began.

36. Shortly before arriving at the Casino, text message communications obtained during the course of the investigation show that Co-Conspirator 1 and the defendant SHANE HENNEN had the following text exchange at approximately 2:53 p.m. EST:

> CC-1: Please don't leak it
>
> HENNEN: I'm not

Based on my training, experience and participation in this investigation, I know that Co-Conspirator 1's request that HENNEN "Please don't leak it" refers to Co-Conspirator 1 asking HENNEN not to share with others the inside information that NBA Player 1 would be removing himself early from the March 20 Game.

37. Among other evidence, text message communications and betting records show that the defendant SHANE HENNEN then likely provided the inside information described

12

in paragraph 36, that is, that NBA Player 1 would be removing himself early from the March 20 Game, to various co-conspirators, thereby enabling them to place fraudulent wagers on NBA Player 1's unders.

38. For example, at approximately 3:28 p.m. EST on March 20, 2024, Co-Conspirator 5 texted the defendant SHANE HENNEN: "Yo did you try calling back via FaceTime," to which HENNNEN responded "Yes." Betting Company 1 records show that at approximately 7:28 p.m. EST on March 20, 2024, Co-Conspirator 5 placed a wager totaling $2,400 (to profit $2,000) on NBA Player 1 "under" points in connection with the March 20 Game.

39. During the March 20 Game, after playing just three minutes, and recording zero points, two rebounds and zero assists, NBA Player 1 removed himself from the game after he complained to team officials of feeling ill. NBA Player 1 did not reenter the game. NBA Player 1 was not subsequently placed on the NBA's injury list and played in his team's next game on March 22, 2024.

40. NBA Player 1's performance in many statistical categories during the March 20 Game was under the designated amounts set by betting companies, including Betting Company 1, in their prop bets related to NBA Player 1. Thus, several bettors, including, among others, Co-Conspirator 5, who wagered the "under" on prop bets related to NBA Player 1's performance for the March 20 Game won those bets.

WHEREFORE, your deponent respectfully requests that the defendant SHANE HENNEN be dealt with according to law.

*Russell Lantier*
RUSSELL LANTIER
Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this 11th day of January, 2025

*Lois Bloom*
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK